**UNITED STATES of America, Plaintiff,**

v.

**2,116 BOXES OF BONED BEEF WEIGHING APPROXIMATELY 154,121 POUNDS, and 541 Boxes of Offal Weighing Approximately 17,732 Pounds, Defendant.**

Civ. A. No. 80–1360.

United States District Court,
D. Kansas.

May 7, 1981.

---

Robert R. Donlan, Dept. of Justice, Washington, D. C., Robert Spiller, Food & Drug Admin., Rockville, Md., Anthony Buccitelli, Dept. of Agriculture, Washington, D. C., for plaintiff.

Charles D. McAtee, Edison, Lewis, Porter & Haynes, Wilbur G. Leonard, Topeka, Kan., for defendant.

## MEMORANDUM AND DECISION

KELLY, District Judge.

This is a statutory seizure action filed by the United States of America, plaintiff, pursuant to Section 673 of the Meat Inspection Act. This relates to the boned beef and offal of a lot of 273 animals, which were implanted with an illegal drug. The drug in question is diethylstilbestrol (DES), a drug allegedly known to cause cancer and other toxic effects, and which drug was implanted in the cattle (steers) after the last legal implant date as established by the

Food and Drug Administration. The implants of DES were still present and were detected at the time of slaughter of the cattle and the carcasses and offal were officially held by the United States Department of Agriculture. Jarboe-Lackey Feedlots, Inc. is the owner of the beef in question and because this is an *in rem* action against the food, this party is not a defendant but only a claimant, intervening in behalf of the seized beef. The government alleges that the meat and offal of these animals is adulterated pursuant to 21 U.S.C. § 601(m)(1), M2A and M3. In this, if the food is adulterated in any of these ways, the law requires that it be condemned and disposed of by destruction or sale, pursuant to order of this Court in conformance with the Act and the laws of the jurisdiction in which the beef was sold.

Initially the matter came to the Court's attention by way of the government's motion for summary judgment and claimant's motion for judgment on the pleadings. Each provided considerable affidavits and other authoritative material accompanied with briefs and arguments. Upon full review and reflection, it was apparent to the Court that considerable disparity of the material facts and law existed and the government's motion was overruled. The thrust of claimant's motion was based on the Secretary of Agriculture's alleged unlawful retention of the seized meat and offal in excess of a 20-day statutory period prior to the filing of the seizure action and in violation of 21 U.S.C. § 672. The timely relevancy of this procedure was not clear to the Court and as a consequence the matter was taken under advisement, pending further evidence and argument. In light of the findings of this Court, as hereinafter set forth, further consideration of defendant's motion appears redundant and is now overruled.

Having reviewed the Court's finding as it relates to the plaintiff's motion for summary judgment, the parties were advised that as a finder of fact, the Court, on the strength of affidavits and other exhibits at hand, probably had sufficient factual data to adduce significant findings of fact and reach an ultimate decision. The parties agreed to this format, subject to the privilege to amend, polish, or otherwise "embellish" their respective data and positions. This proposal was acceptable, assuming then, that each would respond and comply within the week, and the matter would then be ready for final argument and submission. It developed that as each side pondered their respective position, and the Court surmises the strength or *weaknesses* of the other, each began to add and detract, significantly, and to the point that ultimately—neither would agree to the other's contentions or proffers, each finding fault with the other's case, and at which time the Court resolved the impasse by scheduling the matter for full evidentiary hearing. In retrospect, save the learning process garnered in the course of those proceedings, a full evidentiary hearing probably should have been anticipated and scheduled from the outset, but which, ironically, has changed nothing as it relates to the Court's ultimate decision. It has only served to enhance it! As it relates to trial preparation, an orderly discovery calendar was set, the Court available for status conferences and a pretrial conference, at which time certain admissions, stipulations and ultimate orders were entered. In the final analysis, as the case commenced to trial, both sides were fully prepared, each at liberty to exhaust *every facet* of this most provocative issue.

In the course of three weeks' time, the very nature of the issues in controversy, as developed and expounded by both parties, exposed the trial court to the intricacies of varied scientific and technical discipline. In part, it has engaged the expertise and learning of outstanding and dedicated authorities, both private and public, both sides. For the Court, a layman in the truest sense, it has been a learning process throughout. It has required an appreciation and perception in such fields as the sensitivity of chromatography; infra-red spectro-photometry; animal studies of varied character and its relationship to man; biostatistics, i. e., risk assessment or extrap-

olation of data as it might affect the consuming public; biochemistry, including the course of estrogenic hormones and the protein receptor principle; epidemiology; toxicology, including molecular breakdown of chemicals involved; pharmacology; the functions of certain organs, i. e., livers, kidneys, and the significance thereof; and, of course, cancer, other effects and the implications of DES.

While these and others, as brought to the Court's attention, are complex subjects and probably to the experts only the "tip" was explored, thanks to their most candid and objective presentations, hopefully, the thrust of their respective presentations were perceived and retained.

The Court is frank to acknowledge, that while all of the foregoing appeared complicated and foreign to the Court's experience from the outset, a most serious problem in the perception of testimony and its relationship to the "real world," as so often addressed by claimant's counsel, was an appreciation of the metric system, i. e., conversion of grams, milligrams, nanograms, to something common to the Court's own experience. The record is replete with the Court's inquiry, i. e., request to convert into factors readily understood. In the scientific world the quantum of the remnants of the drug in question is measured against the weight of the beef in question in parts per billion (ppb). In this, one nanogram per gram equals one ppb. A grasp of the significance of such findings, in the interest of the Court's realistic perspective, has been exasperating. For example, understanding a resume of the following evidence:

> The government, in part, contends that a finding of 6.25 ppb has been established in certain mice studies to affect a carcinogenic response. As this converts to the human's average consumption of beef, it represents 0.002 ppb or 0.002 mcg/kg (Claimant's ZZ). In the real world, this converts to a consumption of approximately 18,940 pounds of beef per day.

Such an example is only intended to express the complicated nature of this case, but, it is to say such an ultimate finding is also an example of the very kind of factual findings and conclusions as a consequence with which the Court has been required to deal. Simply stated, to adopt claimant's view—a quest of a few grains in a massive field of sand. The Court concurs, the significance of this quantum being the ultimate issue.

In addition, the mass of exhibits, including considerable authoritative references, articles, not the least of which include reams of the Federal Register, have been read and digested. While only referenced in a cursory way, considerable portions of the "Congressional Record," tracing the history and intent of Congress as it relates to the act in question, has been reviewed. While not necessarily helpful, it has satisfied the Court's attempt to more fully appreciate the propriety of that which is at hand. To capsule:

> The Federal Meat Inspection Act was enacted to provide additional legislation which in the view of Congress was "urgently needed for truly adequate protection of consumers, legitimate operators in the affected industries and others associated therewith.... The object of the proposed bill is to eliminate numerous opportunities now present to defraud consumers and endanger public health." Letter from the Department of Agriculture requesting the legislation, U.S.Code and Administrative News, p. 2209 (1967). Likewise 21 U.S.C. § 602, Congressional Statements of Findings, states, "It is essential in the public interest that the health and welfare of consumers be protected." Seizure and condemnation is a means to protect the public from adulterated food. The Secretary is not required to bring a condemnation action when adulteration is only suspected; 21 U.S.C. § 676(b) states, "Nothing in this chapter shall be construed as requiring a Secretary to report for prosecution or for the institution of libel or injunction proceedings, minor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice of warning."

Indeed, the rationale for the reduced governmental burden of proof in this seizure action is the purpose of suppression of a public wrong. See *C. C. Co. v. United States*, 147 F.2d 820, 824 (5th Cir. 1945).

Each witness, the substance of his testimony, the thrust of cross-examination, both sides, the witness's demeanor, his qualifications, experience, his ultimate reliability, believability, has been weighed and perceived. In the recent past, the entire transcript of approximately 4,000 pages has been reviewed by the Court. This review has been most helpful, not only for the purpose of an accurate reference to the evidence recited in this opinion, but also to confirm the accuracy of trial notes, including reflection, i. e., initial impressions through the course of hearing. While this review is obviously required in the interest of accuracy, it has also changed nothing insofar as trial findings are concerned.

Indeed, the Court's ultimate decision comes only after a full contemplation and hopefully perception and appreciation of each of the foregoing and other disciplines, objectively applied to the evidence at hand.

Upon completion of full hearing, the government renewed its motion for judgment, which was overruled. Now counsel have most vigorously argued their respective causes. Some additional briefs, suggested findings of fact and conclusions of law are submitted. In this, the quality of trial counsel, their work products, exhibited throughout the course of these proceedings, was commendable and deserving of comment. In the absence of their own intense preparation, learned articulation and presentation of evidence and witnesses, and their patience, this case, in the hands of less able counsel, might still be ongoing. These traits were noted and appreciated by this trial judge.

In addition, and in furtherance of clarity as it relates to the Court's ultimate decision, some essential rudiments are recited, each having been perceived as fact and none ignored:

DES is one of a class of chemicals known as stilbenes. Stilbenes are not produced metabolically by animals; they do, however, produce effects similar to those produced by endogenous estrogens. It is considered a synthetic estrogen and was first synthesized in 1938 and approved for use in cattle feed in November, 1954. Its use is as a growth promotant, having considerable economic benefit in the livestock business. A new drug application for DES implants in cattle was issued under the Food, Drug and Cosmetic Act in December, 1955. In this regard, approximately 15 milligrams of DES are implanted subcutaneously into the ear of the steer as a pellet, which dissolves over time, and ostensibly provides DES continuously in the animal's circulation. DES is a carcinogen in animals. In 1958, the Act was amended by addition of the Dulaney Anti-Cancer Clause, codified at 21 U.S.C. 360b. The amendment required the FDA to refuse to approve use of a drug if the Secretary found that "such drug induces cancer when ingested by man or animal." DES is such a drug. In 1962, Congress enacted an exception to the Dulaney Anti-Cancer Clause, known as the DES Exception. This exception is codified at 28 U.S.C. 360b(d)(1)(h). In June, 1972, the FDA made an attempt to withdraw approval for the use of DES, the agency action being reversed because of procedural defects. *Hess and Clark Div. of Rhodia, Inc. v. Food & Drug Adm.*, 495 F.2d 975 (D.C.Cir.1974). This decision details the administrative history with regard to DES until 1974. It was not until 1976 that the FDA again took steps to revoke the approval of the use of DES in animals. Notice of hearing was issued in November, 1976. On July 6, 1979, the FDA issued a final rule revoking the animal drug regulations which had permitted the use of DES in cattle as both an animal feed and as a subcutaneous implant. 44 FR 393837. At this time, the FDA issued notice that it was revoking the NADA's applicable to DES for both feed and implants. 44 FR 39618–39619. These notices were to become effective on July 13, 1979, as to the manufacture and shipment. Animal use

of DES drugs was to be discontinued effective July 20, 1979. Following protests from DES users and what would appear to be an obvious in-house political in-play, the effective date of the DES ban was postponed until August 3, 1979, and again postponed until November 1, 1979. 44 FR 42679, 45618, 45764. It was subsequent to this date that the claimant, and probably inadvertently, caused the cattle in question to have been implanted (Government 51).

As relates to the ban, the Court further notes that during the course of this proceeding the manufacturer's second appeal was decided in *Rhone-Poulenc, Inc., Hess & Clark Div. v. Food & Drug Adm.*, 636 F.2d 750 (D.C.Cir.1980). The thrust of this decision, of course, finalizes for all time the FDA ban.

Of interest to the Court is the fact that the appellate court addressed itself to the sufficiency of fact adduced in the administrative hearing engaging different ground rules for admissibility of evidence and a different burden of proof. Some focus is given to this circumstance now, as the gravity of that decision has been repeatedly urged upon the Court, suggesting that the ultimate findings of the FDA commissioner and now of the appellate court be adopted here as final authority. In light of these contentions, and fully aware of the implications suggested by the FDA findings, it is appropriate to assure the parties that the Court has *not*, and an understanding of this best premises and contrasts this opinion.

The thrust of the commissioner's findings are geared to certain conclusions that the drug is "not shown to be safe." For reasons as hereinafter reviewed, this is not the test required by this Court. To explain, in the commissioner's review of testimony, laboratory findings, and the scientific literature in an attempt to discover a "no effect level" for DES, i. e., a dosage level at which DES would not cause cancer or other harmful effects in human beings, he concluded that no such level had been demonstrated and that DES is, therefore, "not shown to be safe since there is no proof that small

amounts of it are not harmful." 44 FR 54, 873–81. The appellate court concludes that: "By proceeding in this matter the commissioner has met his 'initial burden of coming forward with some evidence of the relationship between the residue and safety . . . .' *Hess & Clark*, supra [161 U.S.App.D.C.], at 413, 495 F.2d 993. He is relying not only on the fact that larger amounts of DES are harmful, but upon laboratory studies which conclude that it is impossible to determine a safe level of DES in human beings. This evidence is sufficient to shift the burden of showing the safety of DES to the manufacturers, and as urged here to suffice the plaintiff's case. Id."

It is this Court's view that, as opposed to whatever procedures and burdens are imposed in a governmental administrative hearing, here, in a court of law, where indeed the ultimate "laboratory," in the quest for truth, time-honored requisites are followed. They include the admissibility of competent evidence within the meaning of the rules of evidence. Specifically, as it relates to the perception of factual scientific issues, conclusions are geared to "meaningful projections from reliable data." *Monsanto Co. v. Kennedy*, 613 F.2d 947, 949, 952 (D.C.Cir.1979), Food, Drug & Cosmetic Law Rep. 38.010. Consistent with this view, this Court has not given serious review to evidence emanating from rank speculation. Of paramount import, the concept of due process, in the Court's view, imposes the burden of persuasion on the proponent, here the government, and this burden does *not* shift. Conversely, the proponent's cause is not met on the establishment of certain "negative" findings from which "positive" conclusions are to be drawn. The government's case must be reasonably positive and convincing to meet its burden, however modest.

It is this Court's appraisal of the matter before the commissioner, which incidentally involved the presentation of many of the witnesses before this Court, that had he listened personally and as intently as this judge did, and the burden was similar, his decision probably would have been a differ-

ent one. His, being administrative, involved the presentation of witnesses most of whom submitted their testimony in written form. Some, quite material in this Court's view, were not invited to participate. Others, considered most material in this case, were not cross-examined. In other words, while the entire record before the FDA is most informative and enlightening to this Court, it does not serve to tilt this factfinder.

Lastly, and again in the Court's grasp for perspective, particularly as relates to DES and its implications with cancer and other effects, some solace was given to the oft-repeated idiom of the Grecian, Paraselsus, who first clarified "the dose determines the poison." This truth suggests in part that all chemicals are poisonous and it is the quantum which makes the difference. It follows that DES is a chemical and as a consequence, as any other chemical, is poisonous. Its ultimate toxic effect necessarily depends upon the quantum of its dosage and use. In this, this thesis has been accepted from the outset as the evidence has been weighed. In other words, while the government would suggest that the mere presence of DES in this or any beef is of significance, it has been received awaiting the government's persuasion that the quantum involved in the case at hand would hurt anyone.

As a realist, the Court now appreciates that the consuming public, i. e., approximately 200 million people, have daily and continuously consumed beef of DES implanted cattle for a period of approximately 25 years without a single report of a carcinogenic effect. Why this experience cannot serve as an inadvertent but most persuasive test escapes the Court. Again, as the evidence is reviewed, its significance will come to bear, the effect of the ban precludes henceforth the legal use of DES. This edict is a fact of life and not in issue here. We deal here, therefore, with the matter of "adulteration, if any, of the beef in question, which represents approximately 150,000 pounds of meat," ostensibly distributed in normal commercial channels. All of the experts seemingly agree that as it relates to whatever conclusions are drawn as to the adulteration of beef, it is to assume that this consuming public will consume approximately two ounces per day continuously for the remaining portion of their respective lives. The relationship of such a test to the beef in question again escapes the Court.

### The Meat Inspection Act and the Government's Burden

As a prelude to the resume of factual findings and ultimate conclusions, some discussion of the Act in question and this Court's understanding of the requisite burden of proof is necessary. In this, the requisite portions of the Act in question are as follows:

a. Any carcass, part of a carcass, meat or meat food product of cattle, sheep, swine, goats, horses, mules or other equines, or any dead, dying, disabled, or diseased cattle, sheep, swine, goat, or equine, that is being transported in commerce . . . and that . . . is capable of use as human food and is adulterated or misbranded . . . shall be liable to be proceeded against and seized and condemned, at any time, on a libel of information in any United States district court. . . . (21 U.S.C. § 673).

\* \* \* \* \* \*

The term "adulterated" shall apply to any carcass, part thereof, meat or meat food product under one or more of the following circumstances:

(1) if it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance, such article shall not be considered adulterated under this clause if the quantity of such substance in or on such article does not ordinarily render it injurious to health;

(2)(A) if it bears or contains (by reason of administration of any substance to the live animal or otherwise) any added poisonous or added deleterious substance . . . which may, in the judgment of the

Secretary, make such article unfit for human food;

* * * * * *

(3) if it contains in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food. [21 U.S.C. § 601(m)(1), (m)(2)(A), & (m)(3).]

Again, in the interest of clarity, each definition will be treated separately; however, it is obvious and probably conceded by both parties, that the focus of this case was addressed to (m)(1), and only after the tests applicable to this section are weighed will discussion follow with regard to the others.

In this, as it relates to Section 601(m)(1), the standard for defining "may be injurious to health" as used in the Food and Drug Act is established in *United States v. Lexington Mill & E. Co.*, 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658 (1914). The *Lexington Mill* libel action charged that flour had been treated by an Alsop process by which nitrogen peroxide gas was mixed with air and brought in contact with flour, causing its adulteration. Adulteration was claimed in that the flour contained a poisonous or other added deleterious ingredient which might render the flour injurious to health. A jury returned a verdict in favor of the government, the 8th Circuit reversed, and the Supreme Court affirmed the reversal.

The evidence concerning the presence of poisonous substance, nitrogen, and the possibility of its being injurious to health, was conflicting. The government attempted to show the poison present in a proportion of 1.8 ppm and that it would be injurious to those who used the flour in bread or other forms. On the other hand, respondent showed the process did not add any poisonous or deleterious ingredient to the flour which could in any manner render it injurious to the health of a consumer. The court instructed the jury that it need only find that a substance had been added to the flour. "It is the character—not the quantity, of the added substance, if any, which is to determine this case." 232 U.S. at 408, 34 S.Ct. at 339.

The Supreme Court found that the instruction constituted prejudicial error because it permitted the statute to be read without the final and qualifying words; the instruction failed to state the legal standard that the contaminating material must render the article injurious to health before the statute was violated. The Court reasoned that if Congress had intended to make presence of nitrogen a violation per se, it would not have legislated the additional health-affecting requirement. The purpose of Congress was to prevent injury to the public health. As against adulteration, the statute is intended to protect from possible injury through addition of articles which are poisonous or deleterious and which may render such articles injurious to health.

As to the burden placed upon the government, the Court rejected a standard requiring proof that the allegedly adulterated food contains substances which *will* affect the public health. In order to prevail, the Act imposes on the government the

> burden of establishing, . . . that the added poisonous or deleterious substances must be such as may render such article injurious to health. *The word 'may' is here used in its ordinary and usual signification, there being nothing to show the intention of Congress to affix to it any other meaning.* (232 U.S. at 411, 34 S.Ct. at 340) (Emphasis added).

The Court quoted from congressional records which indicate that poison depends both on the *quantity and the combination* of ingredients. Per se adulteration was not intended. "May be injurious to health" is to be interpreted in its natural and ordinary sense. Where there is no possibility of harm under a *reasonable* consideration of the facts, the food is not within the ban of the statute. Numerous decisions subsequent to *Lexington Mill* have affirmed that the phrase "may be injurious to health" is one of a reasonable consideration of the facts.

The definition of adulteration in the Federal Meat Inspection Act, 21 U.S.C. § 601(m)(1), is identical to that included in

the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 342(a)(1). Both sections state adulteration includes food which "bears or contains any poisonous or deleterious substance which may render it injurious to health." *There have been no decisions under the Federal Meat Inspection Act interpreting this definition of adulteration.* Because of the identical wording and the similar legislative purpose of both Acts, case law interpreting adulteration under this definition in the Food, Drug and Cosmetic Act should be determinative of the interpretation applicable under the Meat Inspection Act.

In *Millet, Pit & Seed Co., Inc. v. U. S.*, 436 F.Supp. 84 (E.D.Tenn.1977), two suits, a civil rights action and a condemnation case, were consolidated. The government seized cases of apricot kernels alleging, inter alia, that they were subject to condemnation as an adulterated food within the meaning of 21 U.S.C. § 342(a)(1). However, the alleged deleterious substance was not an added substance but was one which occurred naturally. Therefore, the applicable standard was not "may be injurious to health;" it was the less stringent statutory standard that the food could not be considered adulterated if the quantity of such substance in the food does not ordinarily render it injurious to health. 21 U.S.C. § 342(a)(1). The Court readily found that the poisonous substance did not render the apricot kernels ordinarily injurious to health. In so doing, it noted that *Lexington Mill*, in quoting from the legislative history of the 1906 Act, recognized that poisonousness rests upon both the *quantity and the combination* of the substance. Many substances, if consumed in excess, will produce some adverse effect. Despite government evidence of the possibility of harm from ingestion of *excessive quantities* of apricot kernels, the Court concluded that under the ordinary uses and ordinary conditions standards for naturally occurring substances, the government failed to carry its enhanced burden of proof.

A substance which occurs naturally and is also added to the environment by man, i. e., mercury, is considered in *United States v. Anderson Seafoods, Inc.*, 447 F.Supp. 1151 (N.D.Fla.1978), aff'd 622 F.2d 157 (5th Cir. 1980). The United States claimed that swordfish were adulterated within the meaning of 21 U.S.C. § 342(a)(1). Before deciding which standard of health injuriousness would be applicable to the seized swordfish, the Court first addressed the question whether the mercury occurred naturally or was an added substance. The trial court determined that because man had significantly affected the total level of mercury in swordfish, the allegedly adulterated fish fell within the first aspect of the definition for added deleterious substances. The Fifth Circuit, however, did not address the trial court's application of the "may be injurious to health standard." The district court interpreted the word "may" to connote a "reasonable possibility."

It does not mean that a food may be prohibited absent absolute certainty that no one under the most extreme circumstances could be harmed. Nothing in the Act or legislative history suggests that Congress intended to proscribe a food simply because it was physically possible for someone to consume enough of it to harm oneself. The Supreme Court has taken notice that a person could be harmed by ingesting a certain level of table salt, or even water. *United States v. Anderson Seafoods, Inc.*, 447 F.Supp. at 1155.

Reliance is placed on *Lexington Mill*, 232 U.S. at 399, 34 S.Ct. at 337; *Berger v. United States*, 200 F.2d 818 (8th Cir. 1952); and *Wood v. United States*, 286 F. 84 (7th Cir. 1923). The Court concluded that swordfish containing 1.0 ppm or less of mercury "pose no reasonable possibility of injury to anyone's health, [therefore] they cannot be deemed adulterous within the meaning of Section 342(a)(1)," *United States v. Anderson Seafoods, Inc.*, 447 F.Supp. at 1159.

Three distinct standards for determining injuriousness to health under 21 U.S.C. § 342(a)(1) have been discussed by the courts: (1) injuriousness per se from the presence of a poison in however small an amount, rejected by *Lexington Mill*; (2) a

reasonable possibility of harm for added deleterious or poisonous substances, defined by *Lexington Mill*; and (3) injurious under ordinary uses and under ordinary conditions for naturally occurring substances.

■ The parties seemingly concur with the foregoing resume as the basic guidelines, the effect of which shapes the decision of this case. Not surprising, there is little concurrence as to how it should be applied. Indeed, the Court's enigma has dealt with the weighing of that which is possible. Such a test, unlike any other known in the Court's experience, offends his sense of due process. Surely, in a traditional way, only the test of that which is probable, i. e., likely, can the truth be found. Possibilities, embodying rank speculation, in any other setting are not admissible, let alone left as the basis of decision. Actually, the Court has prayerfully given more time and attention in his deliberation of the interpretation of this test than the evidence itself. Accordingly, No. (2), i. e., that which is reasonably possible, is adopted as the standard for which the government's burden is tested. In this, the Court has received this case, weighed it and decided it, hopefully with a sense of common sense, the effect of which an objective and fair decision is reached. Simply stated, emphasis to that which is reasonable is the catalyst which breaks the impasse and determines this case. With this understood, and contrary to repeated urgings and inuendoes urged by the government, it is not to say in a close case, i. e., the evidence relatively equal, or even remotely possible, in the interest of consumer safety, the government wins. It is to say that in a court of law, whatever the test, in the event of the proponent's failure to persuade—failure to tip the scales—failure to meet its burden—it loses! In the final analysis, this is the only reasonable test known to this or any court—and applies here. Conversely, it is also to say that the mere presence of DES in this or any beef does not automatically render it adulterated. If Congress so intended, it could have said so! In lieu of such an adamant proclamation, that body seemingly has contented itself to leave such decision to a trial court, and in the exercise of due process, as the Court perceives it, extended to both parties, now each have had their day.

*Sequence of Evidence and the Court's Commentary, with Findings*

A review of the evidence in this case logically commences with the involvement of the Jarboe-Lackey Feedlot as represented here through Mr. Jud Lackey, its president. In November, 1978, his company had received a quantity of DES implants for use in his rather large cattle operation. By November, 1979, and notwithstanding his awareness of the ban, principally in light of the fact that he had requested an extension for the purpose of using up the remaining portions of DES on hand, it is obvious that his hands did implant cattle with the compound. It would appear that on April 17, 1980, of the total number of steers sent to MBPXL for slaughter, at least 197 head of 273 head of cattle were so implanted. Dr. Gerald Rousseau, DVM, the supervisory medical officer of MBPXL, an employee of the U. S. Department of Agriculture, on April 17, 1980, observed the DES implanted pellets in the ears of certain slaughtered cattle and confirmed them to be those of the Jarboe-Lackey Company. He was advised to retain the cattle and to take samples, i. e., seven ears. In the course of events, he segregated the carcasses and followed through the process ultimately resulting in the 2156 boxes of boned beef, including 193 boxes of liver.

While probably not relevant to this sequence of events, puzzling circumstances are noted as they relate to the government's policy as of that point in time: As of November 1, 1979, the DES ban was in effect; however, if cattle so implanted prior to October 31 were presented for slaughter on April 17, 1980, such a condition was considered legal (I & 69). In addition, as of that point in time the government authorized an explant program, the effect of which required the cattle operator to remove the implanted ears 120 days in advance of slaughter, the

program recognized as the "authorized distribution of adulterated beef" (P). Seemingly 0.6 ppt in muscle was considered safe as opposed to whatever quantum it then contended was within the cavities of the Lackey beef.

Typically speaking, the government's monitor program is that certain samples of liver are from time to time forwarded to certain laboratories under government contract. In light of the sensitivity of the equipment used to register a presence of DES, if any, findings under .5 parts per billion in liver are *not* considered significant. In light of this, it is obvious that even today, and henceforth, unless the government has specifically focused on commercial beef to the extent that they have "leveled" on Mr. Lackey's beef, considerable quantities of DES implanted beef pass into commerce—all with the government's acquiescence.

Much of the foregoing is emphasized and repeated throughout the course of this case, perhaps for other reasons, but, it is to remark now that, on hearing this, the Court's reaction to the fervor generated by most persuasive government counsel, as relates to the adulterated nature of the beef in question, was dampered from the outset. These interesting anomalies remained on the conscience of the Court throughout the course of this matter.

Witness Myers, a chemist of the U. S. Food and Drug Administration, received six of the ear samples and submitted them to gas chromatography to confirm the presence of DES, and which was accomplished, the findings running from remnants of approximately 4.5 mg to 6.6 mg, 15 mg maximum having been initially implanted. In this regard, while considerable contest follows as to whether any DES is lodged in the beef, it was apparent from the outset that in light of Myers' finding, the presence of some residue seemed obvious, but probably legally insignificant. It is of interest to note here, however, that only upon commencement of this case and hearing witness Myers, does it become apparent to the Court, that at the time of the filing of the matter, only the claimant had actually tested the edible portion of the beef for the presence of DES in same. While the Court was unable to perceive all of the significant evidence at the time of the motion for summary judgment, it is now apparent to the Court that the same should have been promptly overruled.

Ironically, it developed that the results of the claimant's tests were not admitted as being unreliable (Scofield). In this, inasmuch as the claimant had offered the Scofield findings in the course of its motion to dismiss and for the purpose of suggesting its minute quantity, the Court was at liberty to note the same, notwithstanding the formal inadmissibility.

In the course of events, and shortly prior to the commencement of trial, the government did cause certain specimens of the livers and kidneys to be tested. The ultimate results of these tests engaged a most extensive focus of the parties' and the Court's attention.

Commencing October 9, 1980, certain samples of liver and kidney from the Lackey beef were forwarded to the Chemistry Division of the U. S. Department of Agriculture for analysis by Mr. Hsu and Dr. M. Hoffman, chemist. Simply stated, the test results by gas chromatography and mass spectrometry purported to reflect the detection of no DES in any of the liver samples, however, eight of fifteen kidney samples reflected presumptive positives from .02 to .15 ppb. Two kidney samples were analyzed below .01 ppb and DES was not detected in the remaining five kidney samples. As a layman perceives it, the gas chromatography procedure is intended to determine an approximate quantum of the compound and the mass spectrometry procedure confirms its presence (14). These quantums serve to base the remaining data of the government's case and its gravamen became of considerable significance. In the course of witness Hsu's testimony, the parties respectively expressed considerable interest not only in the manner the gas chromatography procedure was conducted but the significance of the graphs from which

the conclusions were reached. Notwithstanding considerable cross-examination as to the propriety of the ultimate findings, no objections from the claimant were suggested as to the admissibility and these instruments were understandably admitted.

A review of the record reflects the Court's initial confidence in the reliability of witness Hsu and Hoffman's testimony. Indeed, some rather firm remarks to claimant's counsel, in his intense effort to test the propriety of these findings, are noted. In the Court's defense, and hopefully to any layman at this point in time, there was then no real basis for question of the obviously qualified witnesses. Only as the case developed did it appear that each was less than candid. As it relates to Exhibits 57, 58 and 59, it is not to say that the trial court did not retain some quandary as to the witnesses' interpretations of these graphs. To a layman, they surely fail to objectively demonstrate with any precision the substance of what the witness purports to show. It is simply to say that at the time of their respective testimony, the Court was without a basis to appreciate its significance. By example, the reliance upon the technician's observations of certain "peaks" ostensibly are found in these graphs, and which are intended to reveal the precise instance the presence of DES and its quantum is reflected. In most instances, as closely as the Court attempted to follow this evidence, no peaks were noted. Hopefully, such an observation does not offend the scientific world, but it is submitted here to express in part the Court's quandary in this most technical field.

To further explain the Court's present reservations as to the reliability of witness Hsu's interpretations, witness Scofield, also an organic chemist and residue supervisor at the Analytical Bio Chemistry Laboratory, and who had similarly tested for the claimant and incidentally one who routinely tests for the government, out of hand disclaims the reliability of these most important exhibits. In addition, Dr. Robert Sieck, an eminently qualified analytical chemist, and who it appears is the co-author

and assisted in the development of the method used by witness Hsu, having reviewed the exhibits at hand, most persuasively disclaimed their reliability. In light of this circumstance and in rebuttal of the claimant's case, it was clarified that witness Hsu has, for the purpose of these tests, relied upon a certain hepta-fluorobutyryl (HFBT) derivative, and without attempting to relate the technical distinction, suggests that the effect is that it enhances the sensitivity of the Hsu test approximately nine times over. This interesting entree is introduced by Dr. Hoffman in his rebuttal testimony, corroborated by Dr. Jack Watson, a rebuttal witness. At this juncture, it may be said that the thrust of the observations of these witnesses, i. e., Hoffman and Watson, need not be in doubt. It is to suggest that the significance of this entree was not brought to bear in the case in chief. In this regard, claimant's counsel fairly asked the witnesses if the GLC procedures had been modified (Hoffman, ¶ 121), (Hsu, ¶ 47), and this was denied. Government counsel repeatedly assured the Court that this procedure was not different than that routinely administered by the government in its tests for the presence of DES in beef. Claimant's counsel did not pursue this principally after admonitions from the Court. It now develops that neither witness was experienced with this derivative or its use here, Hsu revealing no experience, and Hoffman none prior to June of 1980, the samples in question taken for trial being the principal substance of his. Indeed, given another day, it is to say that claimant's counsel was denied fair cross-examination of either of these witnesses, and the present thrust of the observations and findings of witnesses Hoffman and Hsu is in doubt. For the purpose of this opinion, giving rise to full and fair cross-examination, at which time the foregoing revelations should have been brought forward through either witness Hsu or Hoffman, (Ex. 57, 58, 59), and the ultimate findings probably would not have been admitted in the absence of a fair foundation, save for "what it's worth."

At this point in time, the exhibits are before the Court and as to their propriety, it is to say that the Court places more credence for the presence of DES in beef in the fact that the animals were implanted than in witness Hsu's findings, and to this extent it is acknowledged that the presence of DES is noted. It is not to say that such findings are of any legal significance. In this connection, for the purpose of the ultimate decision, the thrust of which addresses itself to the significance of the quantum, if any, is that, at most .02 ppb are noted in some of the kidneys, the maximum remotely suggested by the evidence. With the Court's reservations as noted, the government's remaining case is as follows.

As indicated, Dr. M. Hoffman was called principally to focus his expertise as it relates to the mass spectrometry findings. These differ from the former, the intended purpose being to establish the presence, not necessarily the quantum, of DES. A rebuttal witness, Dr. Watson, did volunteer that he could ascertain the quantum of DES from these graphs. The Court perceives the latter to be akin to those of fingerprints, which is hardly an available tool to ascertain the weight of a given person, certainly if measured in grams. The suggestion of Dr. Watson is discarded out of hand. Considerable focus was given to the thrust of witness Hoffman's findings and his readings of the graphs from his tests. Again, his findings were intensely focused and controverted by witness Sieck, the propriety rejected by the latter. This witness happened to have assisted in the development of the Donoho Method ostensibly relied upon by the government. His presence and testimony struck the Court as entirely reliable. Inasmuch as the Court has concluded that DES is probably present in the kidneys to the extent noted, corroboration of its presence was not necessarily required. By way of comment as to these exhibits, however, it is certainly to say that interpretation, by reason of its complexity, remains for the experts. Indeed, if the GLC findings presented problems of perception, these graphic readings are more difficult. The trial court listened intently to all sides and studied the exhibits as closely as practicable. In light of the controversy that obviously exists between the eminent witnesses called in this case, they are disregarded as being of any scientific assistance to the Court. Simply stated, a review of these exhibits suggests that the experts can read into them about what they want to read, the Court perceiving nothing and is totally helpless, if, they were intended to be of benefit for either side.

The government then moved to confirm the presence of DES in the muscle or meat portion of the beef. This witness was Dr. Peter Aschbacher, a research physiologist, U.S. Department of Agriculture, who is conversant with radioisotope techniques and techniques of infrared spectroscopy and the chemical interpretation of infrared spectra. His research has developed a process for detection and quantitation of remnants of DES in tissue and excreta. His experience here is with regard to the 14/C DES experiments. The objectives of these studies were to place 14/C label DES implants into the ears of steers and then determine the excretion patterns of 14/C, the distribution of the 14/C within the body, and the extent that the 14/C in various tissues and excreta was associated with the DES molecule. On the strength of a review of the evidence at hand, he opined that residues of DES were probably in the edible portions of the beef in question. Frankly, as the witness came forward, the Court had assumed that this gentleman probably was one of the government's most significant witnesses. Indeed, the thrust of the government's case at the time of the motion for summary judgment would suggest this. The cross-examination of this witness, however, and particularly his remarks as shown in Exhibit M (Aschbacher, p. 81), served to negate his significance, the presence of DES in the meat portion, if any, or of any significance by his standard, remaining in doubt. Certainly if, at best, .02 ppb are found in the kidney, his thesis will not stand.

While the sequence of witnesses were not presented as capsuled, the government next focused attention on those witnesses who

would purportedly relate the significance of the quantum of DES in the beef in question as it may affect the public's safety.

Inasmuch as each scientific witness in part relates his testimony to a certain study conducted by Dr. George H. Gass in June, 1964, i. e., Carcinogenic Dose-Response Curve to Oral Diethyistilbestrol, and his apparent findings are of significance in this case, some focus is given now as to these findings.

This was an animal test wherein C3H female, C3H male, and strain A castrate male mice were divided into test groups that were given feed containing DES at the following levels: 0 ppb, 6.25 ppb, 12.5 ppb, 25 ppb, 50 ppb, 100 ppb, 500 ppb and 1,000 ppb. The test group ranged from 50 to 78 mice. The three control groups ranged from 115 to 136 mice. The government suggests a statistical significant incidence of mammary carcinoma was observed in the group of C3H female mice receiving the lowest dosage (6.25 ppb). The C3H female mice receiving 12.5 ppb and 25 ppb did not show a statistically significant increase in tumors over controls (both of these treated groups showed tumor in 43.3% of the mice as opposed to 33% in the controls .25 ppb group). There is no question that the C3H female mice fed 50, 500 and 1,000 ppb DES developed mammary gland cancer and the evidence of cancer in the treated groups increased with the increasing levels of exposure. The test groups of C3H male and castrated male mice were less sensitive. Some tumors developed in animals fed 12.5 ppb but statistical significance was not clearly apparent below 6.25 ppb of exposure. The obvious points of contention are that the results of this study do not show that low levels of DES cause cancer and do show that low levels of DES do not cause cancer, i. e., that there is a "no effect" level.

This portion of the case commences with the government witnesses presupposing that the Gass report conclusively establishes the absence of any "no effect" level below 6.25 ppb, and as the Court perceives it,

assumes therefore that consumption of DES-implanted beef of *any quantum* renders it adulterated. As the Court perceives it, an ultimate decision as to the propriety of these studies is critical.

Dr. Kenny Crump is a biostatistician and consultant for the government. His forte is that of risk assessment, i. e., the estimate of that which is possible, engaging what is considered the technique of extrapolation. This is an obvious and apparently acceptable aid in the decision making bodies of the Food and Drug Administration. While its reliability under the normal test of evidence, and which would exclude speculation, the witness, without interruption *or* objection, testified in depth as to his procedures and findings. The thrust of his testimony, accepting certain statistical data from the Gass study, is correlated to humans, 6.25 representing .002 parts per billion in the meat. He further references other articles (G–11) relating the average food intake of Americans at about 24 pounds a week, representing about 2.3 pounds of which is beef. If it is to assume that the average DES residue in beef muscle might be .2 ppb, the average dose of DES to Americans from DES residues in beef muscle is approximately .02 ppb. As previously indicated and as the evidence further develops, such a conclusion cannot conform to the evidence at hand. His thesis further assumes that the population of this country at risk is 200,000,000 people, and given a lifetime exposure to DES in meats at .02 ppb, would result in approximately 15,000 extra cancers as derived from the most sensitive mice strain as evidenced by the Gass study.

Dr. Larry S. Andrews is of the Division of Toxicology, Bureau of Foods, and has been called upon to evaluate practical conclusions as to the safety of the chemical in question. He appreciates the Gass findings and others. It would appear the substance of his testimony is that while amounts of DES in the tissue from animals in question are small and likely to be much less in beef muscle, these amounts have never been shown to be safe in food for human con-

sumption. Because DES does cause cancer and birth defects in people and mutations in experimental animals, he does not believe that these amounts of DES are safe for people to eat. As a consequence, he has concluded that consumption of the beef in question may be injurious to health.

Dr. Robert J. Condon is a mathematical statistician with the Bureau of Veterinary Medicine of the Food and Drug Administration. He is presently on detail to the Office of the Commissioner, Associate Commissioner for Health Affairs, Scientific Liaison and Intelligence Staff. His duties at the FDA primarily involve the evaluation of biological test data on the effects of toxic substances and estimating the degree of risk associated with the consumption by humans of toxic substances. Indeed, since 1971 he has been involved in the evaluation of the toxicity and the degree of risk associated with consumption of residues of DES-implanted beef. The witness proceeded to summarize the thrust of the government's case. He is a fully well-intentioned and partisan witness. It should be noted that he was called as rebuttal, principally to address himself to Gass's testimony (as hereinafter noted), disagreeing entirely with the conclusions of Gass. He uses Exhibit 49 to illustrate his point and which the Court perceives is wholly out of proportion as it relates to the rebuttal testimony; the Court was finally convinced that the witness is all things to all people in this case, in that he was called upon to touch upon just about every iota of evidence offered by claimant. He, of course, addressed himself to Gass, Jukes, Jensen and Upson, all of whom are hereafter discussed. The Court's notes indicate that when the witness had finally completed his testimony, it was thought he had lost his objectivity and the thrust of his principal testimony in support of Crump was in doubt.

In addition, Dr. Joseph Rodrick was called as a rebuttal witness in the interest of confirming Crump and Doull (hereinafter noted) and to offset Jukes, Jensen and Gass. His experience in DES is limited; he takes time to attempt to explain the toxicological difference between DES and estradiol (Ex.

29). He confirms that if we are dealing with .02 ppb in the kidneys and extrapolated to .002 parts in the meat, this involves consumption in the aggregate of 150,000 pounds of beef. The Court's impression was that this witness, again, is another catch-all type who was brought back to touch base as opposed to every witness offered by the claimant. He was partisan personified.

Dr. William Hobson, the Director of Primate Research Institute at New Mexico State University, was called. His field is reproductive biology, that is, the reproductive processes in animals. He discusses the hormone system, which controls muturation, i. e., development early in the fetal life through puberty. He uses primates in his research, being the closest available animal model of man. He was interested in the effect of estrogen on the reproductive development in primates and DES is a known potent estrogen. Normally, he presents DES to the animals in a daily dose, depending on the age of the animal. He is interested particularly in two hormones which control reproductive development, luteinizing hormone (LH) and follicle-stipulating hormone (FSH). He is looking for a "no observed effect" level, being a level at which he fails to find a statistically significant effect as opposed to a "no effect" level, which is one wherein he is reasonably certain actually had no effect. He reviews Exhibit 53, being a graph of follicle-stimulating hormone in infant rhesus monkeys, which describes levels in the serum of infant rhesus monkeys treated from the day of birth with 50 micrograms of DES per kilogram of body weight per day (50 mcg/kg). In his judgment, administration of DES completely suppressed levels of follicle-stimulating hormones when compared with similarly treated controls. Exhibit 56 is intended to explain conversion from DES dosages at this level to levels of DES in parts per trillion in human food. Considering the weight of the monkeys, i. e., 2.2 pounds and DES dosage for that kilogram of weight, this converts to 3.0 ppb. This further includes a two-thousand fold safety

factor, i. e., the dosage for the monkeys would be two-thousand fold higher than 50 mcg/kg, i. e., 6,000 ppb. As relates to meat intake, a factor of 500 grams consumption per day is considered. This converts to a pound and two ounces of meat, and assumes a human weighs approximately 130 pounds. Simply stated, if the witness's tests were converted to beef with a comparable amount of DES in it, it converts to 6,000 ppb DES. While the witness proceeded, the Court pondered his own responsibility to apply that which is reasonably possible, and notwithstanding the serious effects known from excessive consumption of the compound, retained reservations as to realistic applications here. Turning to the effect of DES on LH levels in infants from the date of birth, which engages a lower dosage level, i. e., 60 ppb, an elevation in the luteinizing hormone in both sexes of the monkeys, particularly females, was noted, i. e., sex skin swelling. In summary, the lowest level fed, being 6 ppb without a safety factor, is interpreted as follows:

A   All right. This calculation of what we would predict would be a safe level of human exposure in the meat consumed is based on the assumption that we are starting at a level at which we did not observe an effect. Now, I am not confident at this time that we have reached such a level. The lowest level we have fed is 0.05 micrograms per kilograms, and it appears to me that we're beginning to observe an effect.

THE COURT: Which is six parts per billion?

A   Which is six parts per billion without the safety factor. Yes, sir.

Dr. John Doull, a professor of pharmacology and toxicology and who directs the Poison Control Center at Kansas University Medical Center, was next called. His specialty is in the field of toxicology, i. e., the study of adverse effects of drugs. He has worked with Dr. Crump and acknowledges risk assessment as a valid function in the field of toxicology. He states that toxicology does include extrapolation from animal results in that it is both a science, i. e., method of accumulating data, and an art.

In predicting from his data base, the toxicologist's mechanism to indicate his uncertainty is his "safety factor." The size of the safety factor is dependent on his confidence in his data base in relation to predicting for other species. To characterize toxicity, he needs to know the adverse effects that might result and the dose response data. He is aware of enough data to have no doubt that DES is a carcinogen. In addition, DES has teratogenic effects in humans and animals. The existing toxicology data base for DES did not enable the calculation of a safe level in human food and he takes care to explain the procedures he would require. On the strength of his studies, not necessarily his own testing, and accepting the Gass studies, it was his conclusion that there are no "effect" levels on this material and one cannot go on the safety factor route. In other words, there is a "no observed" effect level. It was obvious that the government was focusing considerable attention to the witness in the interest of bringing to bear ultimate conclusions relating to its burden. In this regard, as a preface to his ultimate findings, the witness acknowledges that the existing toxicological data base for DES does not enable a calculation of a safe level in human food. This is not to say that the witness believes that there is not, simply that it has not been established. Perhaps as a contradiction, he further acknowledges that science uses a lot of carcinogens in medicine and wherein the benefit outweighs the risk. Certainly, as the compound exposes humans to carcinogens in a non-medical situation, there is a cardinal rule that you do not expose people to a noxious agent unless you have the full spectrum of information from animal studies. He discusses synergism as the enhancement of response getting a greater effect by adding effects of two agents. While DES has some estrogenic characteristics, it is not the same as estrogen produced in the body. In the final analysis, and while he would probably eat the meat in question, he would hesitate to advise someone else to eat it, his ultimate opinion being that consumption of the beef

in question would be harmful or injurious. This gentlemen was, indeed, the government's most impressive witness. In this connection, the Court interjected several of his own questions in the interest of clarity. A review of some best reveals the state of the government's case at that point in time:

Q  And your testimony as to the risk and the potential hazard to the consuming public is based, again, upon that factor and not upon the marketing of this 154,000 pounds of muscle being held in this court? You have made no risk assessment with respect to the consuming public for a one time consumption of this product, have you, sir?

A  True, because it's my understanding that, you know, what you are asking me as a toxicologist is to speak to the risk associated with the long term low level exposure. Now, if you are asking for an assessment of the toxicological risk following one acute exposure, I would have a different toxicological evaluation.

THE COURT: What would that be, Doctor?

A  I beg your pardon?

THE COURT: What would that be?

A  At the levels that we are talking about, it would be far less—I probably wouldn't be terribly concerned about that kind of exposure. I guess I would have to hedge on that a little bit because it would depend on who I was making that recommendation to. If I were a regulator making that recommendation, I would be a little concerned.

Q  You see, Doctor, I sincerely—please understand that I appreciate that, and I appreciated that distinction this morning on your direct. A regulator having to build in these safety factors and look at the face side of the question marks has one duty and one obligation and one evaluation and one conclusion, as opposed to what we have now arrived at here, is that not correct?

A  Yes. He has a—

Q  Different duty?

A  The toxicologist shares in that when he shares in the responsibility for making that decision, and in those cases the toxicologist tends to be more conservative.

Q  But, you see, I think the clear distinction here is a moment ago when you used the phrase, 'If you have asked me to come here and give you my opinion as a toxicologist with respect to the long range effects of continued,' et cetera, et cetera, et cetera, 'my opinion is one thing.' I want the record to show, Doctor Doull, that I am confident that that's what the plaintiff, the United States Government, has asked you to come here to do, to give that opinion. The opinion that I elicit or hope to solicit from you is your opinion not wearing that regulator's hat, building in all of the factors that the toxicologist must of necessity build in when he is advising a regulator. I am getting down to the facts in this case and these 154,000 pounds of beef.

A  Well, my response—you had asked me about the difference in hazards associated with what we have been talking about, which is repeated exposure versus the single exposure. And my response would be that there is less hazard from a single exposure at the kind of levels that we are talking about than there would be from the repeated or chronic exposure.

Q  Would it be fair to modify the term 'less' with 'significantly less'?

A  That's reasonable. The hazards are appreciably less.

Q  Now Doctor—

THE COURT: I would be concerned, Doctor, any exposure reasonably.

A  Well, it's very difficult to exclude—absolutes are difficult. There is a body of scientific evidence which indicates that there is no bottom line for cancer; that a single molecule of a substance can cause cancer because it can react with the DNA and can cause cancer. If one subscribes to that no threshold idea, then what that really means is

that there is no safe level for DES and even a single exposure would have this DNA effect and could cause cancer.

Q  And do you subscribe to that, Dr. Doull?

A  No, I don't.  I think for DES, for example, there probably is a safe level. I think that the studies we have now have not really established that, and I think that we need some additional work in multiple species to tell us what that level is.  I think if we had that level, we have a perfectly straightforward position to move ahead and do regulatory things on the basis of that level.  This is a hypothetical on my part that there is a safe level for DES, but I think the evidence points someone somewhat towards that if you look at Dr. Gass' study.  For example, his lower dose levels are beginning to fall apart, which indicates, 'I may be getting fairly close to threshold.'  The other scientific evidence which suggests that also, so that's really what kind of leads me to the idea that there probably is a safe level and we just haven't proven what it is.

And further:

THE COURT: Let me stop you. The thing that obviously bothers me here in weighing this, knowing that, appreciating, as well, what you have here is, in effect, some tests on some mice and what would appear to me perhaps to be some one day old monkeys that would appear to me to have been injected or ingested with what has to be an inordinate amount of DES, six point plus-type injection.  No one is suggesting that the implanted beef or the livestock industry or Mr. Lackey or anyone else—ingestion of that kind of quantity.  You see, you have now said maybe there is or probably is a safe level.

A  The problem is that the kind of tests one has to do to demonstrate safety are precisely that kind of test.  We use very large doses.

THE COURT:  You mean on the mouse.

A  For a full life time.  We put the animals under tremendous stress in a sense in the hope that by emphasizing all the adverse effects, we will, in fact, be able to detect those.  The argument is then by using those very unreal conditions we find the things we have to worry about in man.  My concern is not really the hazard of DES; my concern is that we have not failed using the proper toxicological procedure to demonstrate that it is safe.  (sic)  And I have looked hard at the data and I simply cannot be convinced that we have done the necessary scientific steps that we need to take to prove that that material is safe.  It's the same for any chemical agent.  There is a number of things that one has to do to provide the best proof scientifically that we can that it is safe, and all of the elegant things that we do with DES and other chemicals have no bearing on that question when, in the final analysis, it's a question of can we prove that it is in fact, safe, and we haven't done those tests.

Upon completion of this testimony and the government having rested, the Court's perspective of the case, at that point in time, gave rise to its confidence in the government's claim, certainly with some assurance as to its merit.  Indeed, first impressions garnered through the course of the case to this point supported rather stringent remarks extended to the claimant's counsel at the time of its motion to dismiss, which was overruled.  Now, with reflection of all of the evidence, it should be noted, the Court's regret, that his remarks were so extensive.  Now, having perceived the full thrust of this case, both sides, they were doubtless unduly devastating to the claimant and perhaps unduly encouraging to the government.

Claimant's case opens with the presentation of Dr. George H. Gass.  This gentleman was Director of Endocrinologic Pharmacology Research Laboratory and professor of physiology in the School of Medicine

at Southern Illinois University. Doubtless he is best known for his 1964 studies which identify the carcinogenic effect of DES in mice. In this, it should be noted that throughout the course of the government's case, the Court, perhaps naively, has presupposed that its witness evaluations of the Gass report (Ex. 11) were not necessarily in conflict. Certainly, the thrust of most relevant opinions (Crump, Doull, Andrews, Condon and Rodrick) are geared to their interpretation of these findings and this study. Now appreciating the intensity of the issue, it came as no surprise to receive Dr. Gass as claimant's witness. Without reservation, this gentleman has come to testify as to his complete rejection of the conclusions drawn by the government throughout the course of their entire dealings with DES and as it relates to his study and findings. It would appear that this case is the first forum for this gentleman to so vividly express himself, and upon completion of his testimony there was no question in this Court's mind but that he does, indeed, reject the government's underlying thesis. It is his testimony, and has always been his belief, that the 6.25 ppb result in the C3H positive field mice is an aberration and not indicative of the fact that DES is a carcinogen at that level. He insists that his interpretation that the dose response curve is linear has always been ignored. He does indeed believe there is a "no effect" level and it is his opinion that there is no tumorogenic effect at less than 25 ppb, and then only as female C3H mice reflect. He testified that: "If, DES has any carcinogenicity, that it's threshold is somewhere about 25 ppb." He testified further that there is no risk of harm to any person from consuming beef containing DES at the level involved here.

At this juncture, and for the first time, evidence is now before the Court which directly controverts the government's thesis. The obvious quandary now is, whom to believe, and why. Doubtless a determination of this matter probably is a most decisive factor in deciding this case. While the government argues that others are equally entitled to draw objective findings from the Gass study, and indeed they are, it is this Court's judgment that the scientist who has conceived the test, established the criteria for the test, conducted the test, inherently has such a "feel" for the experiments and findings that his opinions are entitled to considerable weight. By way of corollary, it strikes the Court as a circumstance akin to now having some third party designated by the government to replace Mr. Spiller for the purpose of argument. This young gentleman is probably as conversant with the field as any lawyer in the country. He assisted in the DES hearings, he assisted here in the preparation and trial of this case. He has been chided informally with the Court's corollary as relates to reception of Dr. Gass' testimony—"who knows best?" In this, the Court adopts Dr. Gass' testimony as the most reliable as it relates to the interpretations and findings of his study. This is not to say that this Court dares establish as a matter of law, with any precision, a "no effect" level, but to suggest that it is the Court's finding that there probably is one, grossly in excess of .02 ppb in kidneys of the cattle.

Next, the claimant focuses its defense to the government's biostatistic extrapolations and opinions and presents Dr. Thomas H. Jukes, professor of medical physics, University of California at Berkeley. He has worked extensively in the field of nutrition and in the field of cancer chemotherapy. He is a medical biochemist. This gentleman is an obvious and outspoken protagonist for the use of DES in livestock and has been most vocal in his opposition to the movement of the Food and Drug Administration to ban its use. It is reasonable to acknowledge that from the outset, the witness was perceived as partisan for the claimant's cause as some have been for the government. As this courtly gentleman proceeded through his testimony, however, and certainly in his response to sharp cross-examination and the Court's query, the full impact of his testimony began to come through. His experience exceeds any suggested by the government, at least as it relates to the compound in question; his adamancy was convincing. His examples of

the use of certain chemicals with known toxic effects, i. e., vitamin D, insulin, salt, were enlightening and reassuring. By example, natural estrogens are carcinogenic. He clarifies considerable supplies of estrogen are from plant food such as wheat germ and soybeans, all green vegetables, vegetable oils, pointing out that none create an adverse effect on the consumer because the amounts of estrogenic substances consumed are at levels below the injurious level. He is convinced there is a safe level for DES and endorses Dr. Gass' opinion· as to the Gass report. He clarifies further that arsenic is a known human carcinogen and the body has inherent in it a level of arsenic at an obvious no effect level. As relates to DES, it is not cumulative in the body because it is metabolized and excreted, and if the period of withdrawal is lengthened, its level in the body diminishes. The compound is not cumulative nor does it have a cumulative effect in the body. It is his judgment that one microgram per day of DES is quite safe. This is one millionth of a gram, i. e., one part per billion of DES would contain one microgram per kilogram. One part per billion is one nanogram per gram, or one milligram per ton. Referring to kidneys, .02 ppb represents a something less than one ounce in a million tons. .002 ppb, if in the meat, represents 2 grams in a million tons of muscle, or ⅟₁₅ of an ounce in a million tons. 6.25 ppb is 3,000 times as much as .02 ppb. Simply stated, if we were dealing with a million tons of meat to market to the consuming public, there would be ⅟₁₅ of an ounce of DES in the whole. The witness is asked to comment with regard to the thesis that one molecule of even a known carcinogen can cause cancer, to which he concluded that it is utterly impossible because the body contains known carcinogens at a molecular level. By example, the body contains 34 million molecules of arsenic. Cadmium occurs about 50 times the level of arsenic.

In the final analysis, taking into account all of the evidence at hand, it is the witness' opinion that there is no possible risk to the American public in the consumption of the beef in question. At a later point in these proceedings, the witness was addressed by the Court to express without interruption his explanation of this opinion. His response was most convincing. Now having at hand an occasion to again review his testimony, this view is reconfirmed; the Court now convinced that the government has failed its burden of proof. In addition, it would appear that consumption of the beef in question would injure no one.

Dr. Dan W. Upson, a professor of pharmacology and veterinary medicine at Kansas State University, was endorsed by the claimant at the time of the motions for summary judgment, and on the strength of his statements as of then, the Court acknowledged the divergency of factual contentions as relate to the use of DES and its effect to the consuming public. While it may be that this gentleman does not meet the technical requisites insisted upon by the government representatives, in the Court's view his extensive education, training, experience, including that with DES and of course with animals, most convincingly supports the basis for any opinion in this field. In the Court's view, he is a most refreshing, logical and believable witness. As one weighs his responsibilities in the test of evidence at hand, the Court is quite comfortable with the ultimate opinions of Dr. Upson and they are accepted as fact in this case. Indeed, his testimony is wholly corroborated by that of others, both from the government and for the claimant, the thrust of which is to reiterate the gross improbability, if not physical impossibility, of harm to anyone in the consumption of the beef in question.

The witness reviews that, with respect to most chemical substances, there are usually three levels of effect. First, a "no effect level;" second, a "beneficial level;" and third, a "toxicological level."

The witness testified with respect to the intended physiological effects of an estrogen, i. e., to bring about a multiplication of cellular growth. He described the proliferative stage of the estrogen cycle (in the cow 21 days, and in the woman 28 days), and stated its purpose is to prepare the tubular

portion of the reproductive tract to receive new life and to induce the mammary gland to produce milk.

The witness corroborates Dr. Jensen, whose testimony is hereinafter reviewed, and concludes that there is no affinity in muscle for estrogens. They simply do not find a receptor, "home" in muscle.

He testified that he is familiar with the Aschbacher and the Rumsey studies, and that nowhere do they state that DES is present in muscle. He acknowledged that they indicate that 14/C is present in muscle at a slight level, above background, but testified that this does not stand for the premise that DES is present.

He testified that with the exception of some allergic reactions to penicillin which remained in the milk of cows after being treated with penicillin, there are no recorded adverse reactions or human health hazards shown to have been caused by *any* residue from animal drugs.

Dr. Upson evaluated the "worst case," assuming the government's premise that DES is present in the muscle at a level of .015 ppb, which he specifically rejected. However, for the sake of discussion, he calculated the total amount of DES which would be present in the entire 154,000 pounds of muscle, assuming a level of presence of .015 ppb (15 ppt) and concluded that it would amount to 1.0888 mg DES total ingestion, if one were to eat it all. See Claimant's Exhibit DDD. (It should be noted that Dr. Upson used a "rule of thumb" ratio of 30 grams per ounce in his computations, whereas there are only 28.349 grams per ounce. This would reduce his calculations to approximately 1 mg).

As an aside, the witness' classroom experiment brought home to this Court the reality of this central issue. In this, it is to appreciate that if .02 ppb to .15 ppb DES is found in the kidney, thereafter extrapolating at most .002 ppb to .015 ppb in the meat represents consumption of 154,000 pounds of meat.

If reason, i. e., common sense, has its place in the decision of this case, such a proposition defies reason. It was Dr. Upson's ultimate opinion, that there is no way anyone can consume, regardless of his condition, any portion of the beef in question and be injured.

Lastly, the claimant presents the testimony of Dr. Elwood W. Jensen, whose degree is in organic chemistry. He is the Charles Huggins Professor of Biological Science at the University of Chicago and the Director of Ben May Laboratory for Cancer Research. Without further resume of the witness's qualifications, it is to note that this Court considers Dr. Jensen as the most persuasive and impressive of any witness called in this case—either side.

After some foundation, the witness lectured the Court with regard to certain basic rules of chemistry, and of paramount importance, the "law of mass action."

It is his judgment that estrogens contribute to a carcinogenic process in a susceptible system, such as the C3H mouse, only indirectly, and not directly. The C3H mouse is preprogrammed to be likely to develop cancer, noting that thirty to forty percent of the animals develop cancer even without administering estrogen. It is his judgment that DES and/or other estrogens are not true carcinogens because they only give an added push to a system that is predisposed. In analogous systems, similar effects are not noted. If DES were a true carcinogen, it follows, it shouldn't make any difference. Estrogens are permissive factors rather than causative, i. e., they allow things to go on but do not cause them. The witness believes that DES interacts with the protein activator in a cell in an identical manner as natural estrogen does. He suggests that there is no evidence that this identical reaction results in any adverse reaction where the estrogen is DES as opposed to a natural estrogen. It is his judgment that essentially every substance will have a toxic dose if you go high enough; even the most innocuous substance as water. For natural regulators in the body, there will be three levels: first, a level where there is not enough of the agent to cause any effect; second, a level where you

increase the dose to reach a normal, natural response; and third, when you go higher you come to a level resulting in deleterious side effects.

Of paramount importance, however, is the witness's explanation of what goes on in the cell as a hormone acts. Estrogen, be it DES, estradiol, or estrone, goes into the nucleus of a cell but it doesn't go in and stimulate the nucleus. Tissues which need estrogen have in them a specific protein which is called an estrogen receptor. Estrogen reacts with the receptor to form a complex. Cells that respond to estrogen stimulation contain considerable protein receptors. The estrogen binds with the receptor, causing a change in the protein, which is called an activated receptor. In other words, interaction of estrogen and protein receptors makes an activated receptor—form a complex—and is independent of concentration. This binding is reversible and will have a tendency to disassociate again. If the system is diluted, separating estrogen from the receptor and forming a lower concentration, it is not biologically functional. At low levels, the hormone will be "out there" without a receptor and will be inert. In other words, until you have a sufficient concentration of estrogen molecules to encounter a receptor, *nothing* happens. At very low concentrations, the hormone will be unbound to the receptor. It is the witness's opinion that low amounts of estrogen, not finding a receptor, biologically have no effect; there will be a "no effect" level. In this regard, it should be noted that aside from Dr. Jensen, each witness has seemingly drawn an ultimate opinion from conclusionary findings, either for themselves or from others. This witness distinguished himself from the others in that as opposed to them he relates his opinion to a physical phenomenon. It is the Court's opinion that as one would quest for truth, comfort comes when physical evidence controls the opinion. It may be that Dr. Jensen's otherwise uncontroverted testimony is scientifically provocative; it is accepted here as valid.

It was the witness's opinion that there is no conceivable possibility that DES, present at the levels suggested in this case, would have any adverse effect or pose any threat whatsoever to the health and safety of any member of our society, whether consumed in a single meal or whether they continued to consume this on a daily basis (200 grams per day). Specifically, the consumption of the meat, DES ingested even at the alleged level of the kidney here in question, there is not the remotest possibility of injury to anyone. To reach a conclusion, the Court need not confirm as a matter of law the physical impossibility of harm to anyone other than to note that in the final analysis, Dr. Jensen is probably right.

■ Accordingly, in addition to certain stipulations of fact and admissions submitted by the parties, the findings and conclusions as noted in the foregoing resume are deemed to be findings of fact and conclusions of law as required under Federal Rules of Civil Procedure, Rule 52. In summary, and specifically, as relates to 21 U.S.C. § 601(m)(1), the Court finds that the plaintiff has failed in its burden of proof to establish that the beef in question is adulterated. In addition, it is the Court's conviction and finding that the evidence overwhelmingly suggests that this beef is not adulterated.

### The Secretary's Opinion

Throughout the course of this matter, government's counsel has reminded the Court that notwithstanding the findings as now announced above, the Secretary's opinion is paramount—a mandate so to speak—and from which there is no escape. It has been suggested that no matter how unreasonable the Secretary's opinion strikes the Court, the same is binding here, nor is it reviewable!

For the purpose of these findings, it should be first noted that the Court holds the Secretary of Agriculture in the highest regard and is well aware of the judicial responsibilities attendant to his opinion. Conscious of these duties, this case commenced, the Court ever sensitive to the significance of his opinion and with no reason to question its propriety. While per-

haps wholly naive, the Court notes that it came as some surprise to learn that this opinion is not a personal one at all. In other words, Secretary Bergland, now Block, has no personal involvement in the opinion involved here, the same having been administratively delegated unto the Administrator of the Food Safety and Quality Service, 7 C.F.R. § 2.15(a)(2)(iv); *id.* § 2.92(a)(2)(iv).

In the present case, the Secretary's judgment with regard to meat containing DES is to be found in remarks in the Federal Register prefatory to the "Explant Program" regulation. (Ex. 69). Specifically, this document states in relevant part:

> FSQS considers animals treated with DES to have been treated with or exposed to a substance that may impart a biological residue which would make the edible tissues of the animals unfit for human food or otherwise adulterated under the Federal Meat Inspection Act [21 U.S.C. 601(m)].
>
> \*    \*    \*    \*    \*    \*
>
> FDA and FSQS are working closely together . . . to eliminate the illegal use of DES and to require the reconditioning of animals, to which DES has been administered at feedlots, to make them fit for use as food. . . . FSQS bases its action on FDA's determination that removal of a DES implant followed by a withdrawal period of 41 days . . . is necessary to recondition the animals to make them fit for use as food. 45 F.R. 28947, 28948 (Apr. 22, 1980).

Reserving comment as to the propriety of this opinion, we will first address claimant's argument that the notice provisos relating to the implementation of the "opinion" are deserving of consideration. These contentions address themselves to the applicability of the Administrative Procedure Act as set forth in 5 U.S.C. § 553, as opposed to §§ 701 through 706, which deal with judicial review. Indeed, mindful of the Court's comment, as more specifically set forth in pages 19 through 20, certainly being aware as to what purports to be an uneven enforcement and most assuredly a test of due process, these contentions are deserving of review.

In the interest of clarity, some breakdown of the factual resume of events is in order, the salient aspects to be as follows:

April 16: FSQS Administrator signs document containing explant regulation and "Secretary's Judgment." (Ex. 69).

April 17: Lackey beef slaughtered. Rousseau suspects illegal implants—retains beef.

April 21: Document filed at Federal Register Office.

April 22: Document published in the Federal Register.

April 23: Meyers tests ear implants, discovers they contain DES.

April ? : Decision made to bring condemnation action.

May 14: Condemnation action filed in this court.

With this in mind, some historical resume is in order:

The Meat Inspection Act confers upon the Secretary of Agriculture authority to prescribe rules and regulations for the effective administration of the Act. e. g., 21 U.S.C. § 602; 21 U.S.C. § 621. When the Secretary of Agriculture exercises his statutory authority to set standards and prescribe conduct under the Meat Inspection Act, he "must do so in accordance with the substantive rule making provisions of the APA." *Community Nutrition Institute v. Butz*, 420 F.Supp. 751, 754 (D.C.1976). The published rules and regulations of the Department of Agriculture acknowledge that the agency, when acting under the authority conferred by the Meat Inspection Act, is constrained by the Administrative Procedure Act. See, e. g., 35 F.R. 15552. Rule making procedure under the Administrative Procedure Act is governed by 5 U.S.C. § 553.

The Act's notice provision, 5 U.S.C. § 552, provides that all substantive rules of general applicability adopted by the agency as authorized by law and all statements of general policy or interpretation of general applicability shall be published in the Federal Register. Except to the extent that a

person has actual and timely notice of the terms of such a matter which is required to be published, the person may not in any manner be required to resort to or be adversely affected by, a matter which is required to be so published. 5 U.S.C. § 552.

■ The claimant contends that the rules and regulations of the FDA enacted under authority of the Food, Drug and Cosmetic Act are irrelevant for purposes of enforcement of the Meat Inspection Act. Rules and regulations must be adopted by the Secretary of Agriculture or his delegate, the administrative officials designated by law. 21 U.S.C. § 601(a), and with this the Court concurs. Although the meat act grants the Department of Health and Human Services limited detainer authority under 21 U.S.C. § 679(b), it does not confer upon that agency power to adopt regulations under the Meat Inspection Act. The Secretary of Agriculture, although cooperating with the Secretary of Human Services, must adhere to the independent construction of the two acts. "There is no requirement in the Federal Meat Inspection Act that any procedures prescribed in the Federal Food, Drug and Cosmetic Act be followed in issuing regulations or taking other actions under the Federal Meat Inspection Act." 35 F.R. 15553. Regulations enacted under the Meat Inspection Act are inapplicable in defining adulteration under the Federal Food, Drug and Cosmetic Act. *United States v. Articles of Food, etc.*, 456 F.Supp. 207 (D.Neb.1978). Similarly, regulations enacted under the Food, Drug and Cosmetic Act are inapplicable to proceedings under the Meat Inspection Act. *See id.; see also Grand Laboratories, Inc. v. Harris*, 488 F.Supp. 618 (D.S.D., S.Div., 1980), Food Drug Cosmetic Law Reports, CCH ¶ 38,030.

It would appear that there were no regulations of the Department of Agriculture in force on April 17, 1980, through which the Secretary exercised his discretion and determined that DES was a harmful or deleterious substance within the meaning of the second definition of adulteration. 21 U.S.C. § 601(m)(2)(A). The Food and Drug Ad-

ministration, on July 6, 1979, had revoked regulations regarding the use of DES as an implant or a feed additive. (See 44 F.R. 39387, which revoked 21 C.F.R. §§ 522.640 and 558.225, and amended 21 C.F.R. §§ 558.-76 and 558.78). The Secretary of Agriculture, through his delegate, the Food, Safety and Quality Service (FSQS), on October 16, 1979, removed regulations regarding certification of withdrawal periods for DES *fed* cattle. (See 44 F.R. 59498). The FSQS Administrator took that action because of FDA's revocation of the NADA's for DES. The Department of Agriculture had never adopted or published a testing method to detect DES residue and has never issued in The Federal Register regulations addressing use of DES implants.

It was not until April 22, 1980, that the Department of Agriculture issued a final interim rule again bringing DES within the regulatory framework of the Meat Inspection Act. 45 F.R. 26947. This final interim rule, effective April 22, 1980, provided for an explant and reconditioning program for animals which had been implanted with DES after the effective date of the ban, November 1, 1979. The order also reinstituted the FSQS National Sampling Program. However, because the FSQS final interim rule was not effective until April 22, 1980, and was not published in the Federal Register until that date, its provisions are inapplicable to the present proceeding. See 5 U.S.C. § 552. In addition, in the absence of such rules, it would appear that there were no FDA rules and regulations with respect to DES in force on the date of the instant slaughter and seizure. In the absence of such rules, it is the claimant's position that the meat and offal may not be legally condemned under 21 U.S.C. § 601(m)(2)(A).

■ Moreover, biological residue regulations were in force on April 17, 1980. *See* 9 C.F.R. §§ 301.2(zz) and 311.39. However, the definition of biological residue makes no specific reference to DES and is not sufficiently precise to provide a basis for the exercise of the Secretary's discretion in the present action. "A statute which is so

vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process. This rule applies to regulations." *Brennan v. Occupational Safety & Health Rev. Com'n*, 505 F.2d 869, 872 (10th Cir. 1974).

"Statutes [and regulations] prescribing penalties, civil or criminal, must be drafted without ambiguity." *Paccar, Inc. v. National Highway Traffic Safety*, 573 F.2d 632, 645 [9th Cir., *cert. denied* 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed.2d 172 (1978)]. Due process requires that regulations be drafted without ambiguity. *Paccar*, 573 F.2d at 645, 646.

The deficiency of the biological residue regulation is readily apparent when it is compared with precise regulations stating substances which may be used in meat product preparation (9 C.F.R. § 318.8) and which adopt the FDA standards for pesticides, food additives, and color additive residue (9 C.F.R. 318.6). For example, scientists agree that a high level of DDT in consumed food may be harmful. To protect the public from harmful levels, the FDA has established tolerance levels for DDT use in various raw agricultural commodities, including fruits, vegetables, and meat. Different levels of tolerance for different foods are prescribed because it does not follow "that a level which is either safe or unsafe for one food would be equally safe or unsafe for another food." *United States v. Ewig Bros. Co., Inc.*, 502 F.2d 715, 718 (7th Cir. 1974), citing 40 C.F.R. § 180.147. Likewise, permissible residue levels vary with the nature of the residue. See 21 C.F.R. §§ 193.10 to 193.460.

The Meat Inspection Act biological residue regulations fail to identify residues or to establish any tolerance levels. In the Court's view it is impermissibly vague for a regulation illuminative of the Secretary's discretion, in the present proceeding, in defining DES or other residues as either deleterious or injurious, or that food products alleged to contain miniscule amounts thereof are unfit for human food.

Claimant further contends that red meat cannot be condemned as adulterated as defined by § 601(m)(2)(A) where there is no applicable regulation by which the Secretary finds DES is either deleterious or harmful. The Court concurs. The Secretary gave claimant *no notice* that the presence of DES residue would render its meat subject to seizure. Past actions by the Secretary in allowing DES implants, and in permitting the marketing of meat implanted on or before October 31, 1979, but denying the marketing of meat implanted November 1, 1979, show that the Secretary's proceeding under this definition of adulteration would be arbitrary, irrational and capricious, and punitive. Until the FDA revocation of DES NADA's, steers implanted with DES were monitored for excessive residue through post mortem examination of livers. *Even when this examination revealed a measurable residue, the red meat from the animal was not deemed adulterated and was not withheld from sale as government approved meat.* May the Secretary without publication of rules or regulations reverse his position on April 17, 1980? DES implanted steers had not been deemed adulterated prior to that date. Due process of law does not permit such an arbitrary and capricious change in position without notice and without precise regulations based upon substantial evidence. Regulations regarding DES implanted steers were not issued by USDA until April 22, 1980, when FSQS, as an emergency order, issued its explant regulations. 45 F.R. 26947.

The rule making procedure applicable in defining a poisonous or deleterious substance under definition two [21 U.S.C. § 601(m)(2)(A)] takes the place of proving injuriousness to health under definition one. [21 U.S.C. § 601(m)(1)]. Rules adopted and published in accord with the APA provide a forum for evaluation of scientific data and determination of potential harm. Directly affected persons have an opportunity to appear and standing to challenge an adopted rule. These safeguards limit agencies' propensities to be arbitrary and capricious, and give form to Congress' broad delega-

tion of power. They prevent the prospect of declaring harmless substances as deleterious or poisonous. Without this rule making procedure conducted by the Department of Agriculture, there has been no relevant forum to determine the alleged hazard, or probability of presence, of DES residue. A determination of adulteration cannot now be entered solely upon the Secretary's assertion that DES residue may render the meat unsafe as human food. Nor can the Secretary of Agriculture rely on the administrative hearing record of the FDA in considering the revocation of the FDA NADA's.

In summary, the Secretary of Agriculture had not, through published order or regulation, as of April 17, 1980, given notice of the exercise of his alleged discretion in finding the red meat of DES implanted steers to be adulterated within the meaning of 601(m)(2)(A). Absent actual notice of the April 22, 1980 order, the order is ineffective pursuant to 5 U.S.C. § 552. Without an enforceable rule or order, the Secretary's attempt to deem the detained red meat and offal adulterated because of the possible presence of DES residue is arbitrary and does not comport with due process. The imprecise biological residue regulations are unconstitutionally vague as a basis for application of the second adulteration definition. Because of the absence of valid rules or orders confining the Secretary's discretion, 21 U.S.C. § 601(m)(2)(A) is constitutionally defective as applied to the present proceedings. To meet its burden of proof the government must prove that there is a *reasonable* possibility that the seized meat is potentially injurious to health. An attempt to short circuit this burden of proof is impermissible.

The claimant further urges that unfitness, as defined in the opinion, is a finding independent of that of injuriousness and deserving of comment. In this, the more problematical element of the definition is the phrase that the substance be one which "may in the judgment of the Secretary make such article unfit for human food." The first question presented is the congressional purpose in authorizing the Secretary

to determine *unfitness.* Claimant contends that unfitness cannot be equated to injurious to health; for, if it were, the first and second definitions of adulteration would be indistinguishable. Further, unfitness is not equivalent to unsafe; the standard of unsafety is used in definitions (2)(B), (2)(C), and (2)(D), but not in (2)(A). Additionally, unfit cannot mean filthy, putrid or decomposed, as then the second definition of adulteration would be equivalent to the third definition. Using the same reasoning, the added substance which may render the article unfit cannot be one added to increase the product's bulk or weight, or to reduce its quality or strength, or to make it appear better or of greater value than it is, as these conditions are included within alternative definitions of adulteration.

The Food, Drug and Cosmetic Act of 1938 utilized the term "unfit for food" in its definition of adulteration. 21 U.S.C. § 342(a)(3) (1938). *United States v. 24 Cases, Etc.,* 87 F.Supp. 826 (N.D.Me.1949), construed the term "otherwise unfit for food" in light of the congressional purpose. The Court concluded that the phrase must have a meaning independent from filthy, putrid, and decomposed, different from abnormal odor, taste, or color, and independent of injurious to health. "Otherwise unfit for food" was construed by the Court as strengthening and enlarging the intended scope of the coverage of the food act. Under the facts of *United States v. 24 Cases, Etc.,* the Court found canned herring roe unfit food because it was excessively *tough and of rubbery consistency.* The determination whether the product is so tough as to be unfit for food, "is solely a factual one, and must be determined by the Court in a trial on the merits." *United States v. 24 Cases, Etc.,* 87 F.Supp. at 828. The standard is one which an average person, under ordinary conditions, would use when finding food not suitable for chewing and swallowing. *United States v. 449 Cases, Etc.,* 212 F.2d 567 (2nd Cir. 1954), also discusses unfitness.

Claimant submits to the Court that Rodney E. Leonard, then Deputy Assistant Sec-

retary of Agriculture, when testifying regarding the Meat Inspection Act before the House Subcommittee, was questioned regarding the definitions of adulteration in proposed H.R.6168. Mr. Leonard stated:

> What we are trying to do is make our definition consistent with Food and Drug language so we are not applying one standard to meat and have another standard apply to other products. (Testimony, July 26, 1967, p. 34).

Indeed, the definitions of adulteration pursuant to the two acts are nearly identical. However, the problem phrase in 21 U.S.C. § 601(m)(2)(A), regarding the judgment of the Secretary, is not included within the parallel definition of the Food, Drug and Cosmetic Act, 21 U.S.C. § 342(a)(2). Additionally, no similar discretion was ever granted to the FDA pursuant to the added poisonous or deleterious substance definition, [342(a)(2)] under the 1938 enactment or amendments thereto.

Mr. Leonard did testify as to the agency's desire to specify adulteration in detail:

> I think it is also to the advantage of the processor, or manufacturer, if we try to spell these things out as specifically as we can so he knows what he is dealing with. Otherwise, he would need counsel all the time because the department or the agency could more or less specify what adulteration meant as it went along. (House Subcommittee, July 26, 1967, pp. 34–35).

Broad ad hoc exercise of the discretion granted to the USDA by 21 U.S.C. § 601(m)(2)(A) would be inconsistent with this stated desire to define with specificity. Indeed, claimant urges that processors and manufacturers would be subjected to intolerable uncertainty if the Secretary's discretion could be exercised without rule making proceedings by the USDA, or implemented with prior notice.

In light of the foregoing, claimant suggests perhaps the discretion granted by § 601(m)(2)(A) was intended to provide a means to extend the definition of adulteration, through proper rule making procedures, to then unanticipated developments which might later be found through adequate testing to render meat unfit. It is noteworthy, however, that when the second session of the 90th Congress adopted the Animal Drug Amendments of 1968, P.L. 90–399, amending the Food, Drug and Cosmetic Act, no concurrent amendment was made in the Meat Inspection Act. [Compare 21 U.S.C. § 342(a)(2)(D) with 21 U.S.C. § 601(m)(2)(A)]. The USDA did initiate a screening program to detect DES residues but never initiated a program or regulations specifically addressing condemnation of meat containing DES residues. Congress granted authority regarding use of DES in animal feed and implants to the FDA, not to the USDA. However, inspection and enforcement under the Meat Inspection Act is clearly vested in the USDA.

In summary, claimant contends case law, congressional history, and statutory construction provide authority to determine the classifications of food conditions which may render food adulterated under this second definition. Unreasonable toughness such as that examined in *United States v. 24 Cases, Etc.*, 87 F.Supp. at 826, renders food unfit. Particular animal feeds which would result in offensive texture, color, consistency, or alter the normal ratio of edible nutritional meat to waste products may also render meat unfit. *See* 113 Cong.Rec., 33849–33859 (1967). In a condemnation action in which the burden of proof is placed upon the government, the particular unfitness of the product to be condemned must be proven as a matter of fact. *United States v. 24 Cases, Etc.*, 87 F.Supp. at 828. *See United States v. Lexington Mill & E. Co.*, 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658 (1914). The allegation of unfitness must be independent of the allegation of injuriousness; unfitness for human food is an independent definition of adulteration. The government has failed to identify the alleged unfitness, and to show that the Secretary's discretion was properly exercised. The Court concurs generally with the claimant's contentions, however, suggests that consideration of this thesis is fully addressed and adopted below but for other reasons.

*Judicial Review*

While the foregoing findings should suffice and comment as to the propriety of the Secretary's opinion is probably not necessary, in light of the fact that a substantial thrust of the plaintiff's case is geared to this opinion and as it is of significance here, the Court, if permissible, and within the purview of its authority, now addresses the issue directly. In this, the Court has retained some reservation, having closely reviewed the provisions of 5 U.S.C. §§ 701 through 706.

Section 701(a)(2) provides that these provisions do not apply when "agency action is committed to agency discretion by law." In the only case in which it has mentioned this exception, the Supreme Court explained that it applies when the statute authorizing the agency action is "drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). The lower courts have quoted this language literally dozens of times and are frankly confusing. At first glance it would seem, however, that the broad discretion granted the Secretary of Agriculture to exercise his "judgment" whether something "may be unfit for human food" would fall within the section 701(a)(2) exception.

Claimant contends that in the present case there is no indication that Congress intended to preclude judicial review of USDA action taken pursuant to the Meat Inspection Act. Claimant urges that the Senate debate concerning the Meat Inspection Act, included in 113 Cong.Rec. 35357 (1967), discusses the statutory power given to the Secretary to take over meat production plants which are not in compliance with federal law. In response to inquiry, the Senate was assured by Senator Miller, the Iowa Senator serving on the Senate Committee on Agriculture and Forestry who contributed to drafting of the Act, that the action of the Secretary would be subject to the judicial review provisions of the Administrative Procedure Act. Further, the purpose of the Meat Inspection Act, to protect the consumer from unwholesome meat through court-ordered condemnation, supports the contention that the Secretary's exercise of discretion is subject to court review.

■ It is this Court's view that a district court may set aside an agency determination if it is found "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "To make this finding the Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* supra at 416, 91 S.Ct. at 823. The United States Court of Appeals for the District of Columbia states that an agency "cannot act arbitrarily nor can it treat similar situations in dissimilar ways." *Garrett v. F.C.C.,* 513 F.2d 1056, 1060 (D.C. Cir.1975). Further, "agency action cannot stand when 'it is so inconsistent with its precedents as to constitute arbitrary treatment amounting to an abuse of discretion.'" *Id.* Agency regulations are issued for the benefit of both the agency and public, and the agency must be held to the terms of its regulations. *United States v. Coleman,* 478 F.2d 1371, 1374 (9th Cir. 1973).

It is generally recognized that agency action that fits the exception is subject to "limited" review, *Littell v. Morton,* 445 F.2d 1207 (4th Cir. 1971). Probably the soundest view was given by the Ninth Circuit in *Ness Investment Corp. v. United States Dept. of Agric., Forest Service,* 512 F.2d 706, 715 (1975), where, after a lengthy and detailed discussion of the issue, the Court of Appeals declared:

> Where consideration of the language, purpose and history of a statute indicate that action taken thereunder has been committed to agency discretion: (1) a federal court has jurisdiction to review agency action for abuse of discretion when the alleged abuse of discretion involves violation by the agency of constitutional, statutory, regulatory or other legal mandates or restrictions; (2) but a

federal court does not have jurisdiction to review agency action for abuse of discretion when the alleged abuse of discretion consists only of the making of an informed judgment by the agency.

This analysis dovetails nicely with Davis' rationale [Davis, Administrative Law Treatise, § 28.16 (Supp.1976)]. We presume that Congress never intends to give an agency discretion to violate a statute, much less the Constitution. At any rate, it is quite clear that a reviewing court is *not* empowered to substitute its judgment for that of the agency. *Overton Park*, supra 401 U.S. at 416, 91 S.Ct. at 823. As a matter of substance, the agency's judgment will fall only if it flunks the "rational basis" test. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Hurley v. United States*, 575 F.2d 792 (10th Cir. 1978). "The arbitrary and capricious standard of review does not require that the agency's decision be supported by substantial evidence, but only that it have a rational basis in the law." *Id.* at 793–94.

In every event, the Court is comfortable with these guidelines and is convinced the findings set forth in Exhibit 69 present sufficient data on which a judgment can be made as to the propriety of the ultimate decision.

The claimant contends that the alleged multitudinous examples of arbitrary action in the present condemnation proceedings are so numerous that an exhaustive listing is beyond the scope of its supplemental brief. However, a flagrant example urged by claimant is the USDA's departure from prior practice of permitting marketing of meat suspected or actually found to have DES residue. Claimant further contends that the government seeks to avoid arbitrariness by asserting § 601(m)(2) as a valid basis for finding adulteration in this proceeding, based upon the post-seizure, April 22, 1980, publication of the USDA explant program. 45 Fed.Reg. 26947–26950 (1980).

While the Court concurs with claimant's contentions, this conduct does, in and of itself, serve as a basis for its opinion.

Simply stated, it is the Court's view that when an administrative opinion is geared to wholly unfounded bases of fact, none of which can be reasonably established, it makes no sense at all. Such conduct is arbitrary and irrational and is most deserving of the Court's review. This is such a case.

In great measure, on the strength of the findings reviewed above, the following clarification is in order. A pertinent portion of the opinion is repeated in the interest of clarity:

> FSQS considers animals treated with DES to have been treated with or exposed to a substance that may impart a biological residue which *would* make the edible tissues of the animals unfit for human food or otherwise adulterated under the Federal Meat Inspection Act [21 U.S.C. 601(m)]. (Emphasis added). (Ex. 69).

If the evidence adduced in this case, even by the government's standards, suggests that DES implanted cattle probably *won't* make the edible tissue of the animal unfit for human food, by what authority may a Secretary summarily conclude that it would? Without review, at best, the government's evidence suggests that it is remotely possible (Doull) that implanted cattle render the beef adulterated.

And further:

> FDA and FSQS are working closely together … to eliminate the illegal use of DES and to require the reconditioning of animals, to which DES has been administered at feedlots, to make them fit for use as food. … FSQS bases its action on FDA's determination that removal of a DES implant followed by a withdrawal period of 41 days … is necessary to recondition the animals to make them fit for use as food. [45 F.R. 28947, 28948 (April 22, 1980)].

This Court has attempted to reasonably track the government's anomaly as it relates to its treatment of DES implanted cattle; for whatever reason it has acquiesced in the slaughter and distribution of

DES implanted beef. At some point in time, it is acknowledged that DES is ingested into the body system of the steer. By its calculations, DES, at the time of slaughter, is measured in parts per trillion, i. e., .6 ppt (p. 19). Now, recalling government counsel's argument that DES is DES by any quantum, it strikes the Court that if the administrator of the Food Safety and Quality Services distinguishes *that* quantity from what is anticipated in the normally implanted steer, i. e., .02 ppb in the kidney (Aschbacher), as here, in the interest of making the animal fit for food, such a distinction is wholly arbitrary. Indeed, if these are the bases of the Secretary's opinion, then the Court must conclude that *his* opinion makes no sense at all. It is irrational and is not deserving of this Court's consideration. It is without merit and it fails.

*Adulteration Under 21 U.S.C. § 601(m)(3)?*

■ In the interest of clarity the last section of the Act under which the government proceeds is repeated as follows:

The term "adulterated" shall apply to any carcass, part thereof, meat or meat product under . . . the following circumstances: . . . if it consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food.

The government, by its argument, seemingly contends that the key provision of this section is "or is for any other reason", suggesting that the intent here is to prevent the consumption of meat products for reasons not covered in § 601(m). It is certainly obvious that this case does not include contentions or evidence relating to suggestions of filthy, putrid or decomposed substances. Claimant suggests that this section is not applicable, these words meaning disintegration, decomposure or change in the product, and that the words are to be considered in their usual and ordinary meaning. 1 Toulman, the Law of Foods, Drugs and Cosmetics, § 14.10 (2d ed. 1963). Claimant further suggests that the cases collected in Anno., Food-Adulteration-Federal Statutes, 45

A.L.R.2d 861, confirm the interpretation that this definition of adulteration addresses itself only to materials which occur naturally or unintentionally in the food product. Examples are decomposed food, mold and filth arising from insects and rodents commonly found in food processing areas. Claimant argues that the disjunctive phrase "or otherwise unfit for human food" has presented the courts with difficulty. Although the phrase has been construed as having strengthened and enlarged the scope of the definition, the extension has stopped short of including the intentional additions of substances to food. The disjunctive allows the finding of adulteration where food is discolored or ill-smelling, conditions which commonly occur and are not included in the enumerated conditions. *See United States v. 1,500 Cases More or Less, Etc.*, 236 F.2d 208 (7th Cir. 1956); 1 Toulman, the Law of Foods, Drugs and Cosmetics, § 14.11; Anno., Food-Adulteration-Federal Statute, 45 A.L.R.2d 861.

The Court concurs generally with the claimant's contentions and it is found that the beef in question is not adulterated within the meaning of this section of the Act. Of paramount importance is the fact that this section involves a finding within the realm of that "which is probable," as opposed to the more modest test discussed above. It is doubtful if either party would seriously contend that such a test has either been reached or approached. In the Court's view no evidence was even offered consistent with these conditions.

Again, the findings and conclusions as noted in the foregoing resumes, as relate to §§ 2A and 3 of the Act, are determined to be findings of fact and conclusions of law as required under the Federal Rules of Civil Procedure, Rule 52, and in all respects the Court finds that the plaintiff has failed in its burden of proof to establish that the beef in question is adulterated. As a consequence thereof,

IT IS, THEREFORE, CONSIDERED, ORDERED, ADJUDGED AND DECREED that the plaintiff's complaint *in rem* should be and is hereby dismissed; that the war-

rant of arrest entered by this Court on the 14th day of May, 1980, should be and is hereby set aside. In this regard, the claimant, or his authorized representative, on the 8th day of May, 1981, at 2:00 o'clock P.M., or at his convenience thereafter, may present a certified copy of this order to the U.S. Marshal or his duly authorized representative at Wichita, Kansas, at which time the beef in question, being approximately 2,156 boxes of boned beef, including 193 boxes of liver, now in storage at the Kansas Cold Storage Plant of Wichita, Kansas, shall be released unto him.

The costs of this action, including the cost of storage of beef, are assessed against the government.

Claimant's claim for attorney fees and costs of litigation are taken under advisement. In this, the Court is mindful of the provision of the Equal Access to Justice Act but in doubt as to its applicability here. Claimant counsel is at liberty to prepare his motion and briefs as relate to this matter at his earliest convenience.

The Court is further mindful that the commercial value of the beef in question has probably diminished by reason of time and delay. In this, it is assumed that an appropriate claim will be processed, either under the provisions of the Federal Tort Claim Act or perhaps within the framework of this litigation. In every event, this Court retains jurisdiction as to its disposition.

IT IS SO ORDERED.